Frederick E. Hastings, for Himself and on Behalf of All Other Similarly Situated Preferred Stockholders of the International Paper Company, Who Shall Come in and Contribute to the Expense of This Action, Appellant, v. International Paper Company and Others, Respondents.

First Department, May 2, 1919.

Corporations — right of stockholders to dividends — right of directors to determine when dividends shall be declared and paid — rights of preferred stockholders to dividends — duty of directors to set aside sufficient funds for depreciation and for other purposes — provisions of preferred stock certificate and of articles of incorporation not depriving directors of usual powers as to declaration of dividends — when discretion of directors in refusing to declare and pay dividends upon preferred stock will not be interfered with.

Stockholders are not creditors of a corporation, but are simply the owners of certain shares or interests therein. They are entitled to a distribution from the corporate property, as a general rule, only at such times as corporate funds are made available for distribution among the stockholders by proper action on the part of the board of directors.

The directors of a corporation alone may say when, how and to what extent dividends are to be paid.

The purchasers of preferred stock are supposed to purchase and hold the same with full knowledge of the general powers of the board of directors and with full knowledge of the discretionary powers vested in such

board, not only to declare dividends, but to set aside from the corporate funds and property, from time to time, such sums at they may deem necessary for the general purposes of the business in which the corporation is engaged.

It is the duty of the board of directors to set aside sufficient funds for depreciation and for all contingencies which may be reasonably expected to arise, as well as sufficient funds and property to enable the company to do and carry on its ordinary business.

The term "surplus net profits whenever ascertained" as used in certificates of preferred stock providing that the holders thereof "are entitled out of any and all surplus net profits whenever ascertained to cumulative dividends * * *, payable in quarterly installments in preference and priority to any payment of any dividend on the common stock for such quarter," cannot be taken to mean simply surplus carried on the books of the company, but contemplates surplus net profits over and above all surplus and reserves made by the directors in the exercise of their discretion for the purpose of properly conducting the corporate business. A certificate may be so drawn, however, as to entitle a preferred stockholder to the payment of interest or dividends immediately out of the first profits made by the corporation.

Neither the aforesaid certificate of preferred stock drawn in the usual terms nor the articles of incorporation deprived the directors of their usual or ordinary powers and duties respecting the management of the corporation and the declaration of dividends.

A proposal by the board of directors of a corporation to adjust and settle deferred dividends upon the preferred stock with such of the holders thereof as were willing to accept such settlement, by paying seven and one-half per cent of such accumulated dividends in cash, fourteen per cent thereof in preferred stock, and twelve per cent in the common stock of the corporation, was accepted by preferred stockholders representing approximately ninety-one per cent of the preferred stock. Said proposal was the direct result of a condition, partially due to the war, which demanded immediate action on the part of the directors to provide sufficient funds to carry on the business and retire or refund outstanding bonds. Since the aforesaid proposal the corporation has made large profits sufficient to enable it to pay the dividends to the preferred stockholders who refused to accept the proposal. *Held*, under the evidence, that the discretion of the directors at the date thereof in making the aforesaid proposal and in refusing to pay the deferred dividends to the stockholders who refused to accept the proposal should not be interfered with;

That the directors were well within their powers in refusing to distribute dividends from the first substantial gain the company had made, especially since said profits were based on abnormal business conditions and since the value of materials held by the corporation may decline.

But if the action of the board of directors had actually made available a sum of money for dividends the stockholders who refused to accept the

aforesaid proposal would have a right of action at law to recover the amount due on their stock.

The court should not intervene and set aside the discretion of duly elected directors skilled in the business and in the affairs of the corporation intrusted to them, unless it is very sure that it is as fully informed of the conditions and necessities of the corporation as were the directors and that there has been on their part a clear breach of trust.

APPEAL by the plaintiff, Frederick E. Hastings, from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the county of New York on the 21st day of December, 1918, dismissing the complaint on the merits upon the decision of the court after a trial at the New York Special Term.

*H. Louis Jacobson* of counsel [*Jacobson & Pollock*, attorneys], for the appellant.

*Lansing P. Reed* of counsel [*Harold W. Bissell* with him on the brief; *Stetson, Jennings & Russell*, attorneys], for the respondents.

MERRELL, J.:

The plaintiff, who is a preferred stockholder of the International Paper Company, brings this action, in his own behalf and in behalf of others similarly situated, to compel the company, through its board of directors, to declare deferred dividends which had accumulated on the preferred stock held by the plaintiff and others.

In 1916 the board of directors of the defendant company began the consideration of a plan to provide funds for the purpose of retiring outstanding bonds soon to fall due and for the payment of accumulated dividends on the preferred stock. It was also considered necessary to provide $10,000,000 additional working capital. The accumulated dividends at that time amounted to $7,506,244.50, or thirty-three and one half per cent on the outstanding preferred stock. The total bonded indebtedness of the corporation was $14,497,000, of which $10,151,000 fell due in 1918. The plan was perfected in January, 1917, and a proposal sent to the preferred stockholders, bearing date on the thirty-first of January. This proposal, setting forth the above facts, proposed that the stockholders consent to the " creation of a new First and

Refunding Five Per Cent. Sinking Fund Mortgage," to secure the payment of bonds aggregating $20,000,000. The proposal then stated that the " Directors unqualifiedly believe that it is for the best interests of all stockholders that the Company utilize a very substantial part of its earnings for the calendar years 1916 and 1917 for the retirement of bonded debt, and your Directors are certain that stockholders will share their view that this policy will greatly strengthen the Company and thus benefit the stockholders."

The proposal further stated: " At the time the Directors recommended the proposed bond issue they also, in conjunction therewith, unanimously voted to offer to such Preferred Stockholders of the Company as shall accept the offer and deposit their stock as hereinafter provided, in full settlement of all unpaid dividends,"

" 7½ per cent. of the face value of their holdings of Preferred Stock *in Cash.*

" 14 per cent. in 6 per cent. Cumulative Preferred Stock.

" 12 per cent. in Common Stock, such dividends to be paid in part out of earnings accrued prior to March 1, 1913, and in part out of earnings accrued thereafter, provided, however, that the holders of an amount of such Preferred Stock which the Company and the Committee hereinafter referred to shall deem sufficient shall accept said offer by depositing their stock with the Bankers Trust Company, 16 Wall Street, New York City, Depositary of a Committee * * * who have been requested and have consented to represent such stockholders under a deposit agreement, copy of which is attached hereto. * * *

" Your Directors are firmly of the opinion that it would not be wise nor in the interest of the stockholders to attempt to *liquidate the accumulated dividends in cash,* and that by the proposed plan the equity of the stock in the already valuable property which the Company owns will be greatly increased."

Preferred stockholders representing approximately ninety-one per cent of the preferred stock came in and deposited their stock under the aforesaid proposal. The plaintiff and other preferred stockholders, representing $2,054,500 of the preferred stock, did not, however, accept the offer of the company and failed to deposit their stock, and the unpaid

accumulated dividends on such stock, amounting to the sum of $688,257.50, are still carried on the books of the company as a liability.

On May 11, 1917, in order to carry into effect the aforesaid proposal, a meeting of the directors was held and a resolution adopted which recited, among other things, the terms of the proposal and that sufficient of the preferred stockholders had deposited their stock to justify the company " in confirming said offer and making the plan operative." The resolution then provided:

" *Now, Therefore, be it resolved:*

" 1. That the Company hereby confirms said offer for the settlement and adjustment of the deferred dividends upon its preferred stock so accepted by the Committee representing the holders of 196,235 shares of said stock, and declares the said offer so accepted to be final and binding upon it, and the plan for the adjustment of said dividends to be operative.

" 2. That for the purpose of adjusting and settling in full the deferred cumulative dividends upon the outstanding preferred stock of this Company, a dividend of 33½% upon such stock is hereby declared payable 7½% in cash, 14% in preferred stock, and 12% in common stock, and that such dividend shall be paid to the registered holders of certificates of deposit of such preferred stock of record on June 1st, 1917, upon surrender to the Bankers Trust Company, depositary, of such certificates on or after that date; and that such dividend shall be paid on or after that date to the holders of undeposited preferred stock who shall present to the Company their certificates of preferred stock to be stamped with a notation thereon to the effect that the *accumulated dividends have been settled and* paid in full."

It, therefore, appears that the resolution simply made available sufficient cash to pay seven and one-half per cent on the preferred stock and authorized the requisite amount of stock to be issued to meet the requirements of the proposal. No claim is made that any dividend was intended to be declared other than as above stated, and no dividend was declared, except and in the manner thus adopted. The whole plan was worked out with the view of placing more funds at the disposal of the company and specifically stated that a

liquidation of accumulated dividends in cash was impracticable. Such declaration of a stock dividend distributed no actual property or assets of the company, but simply enabled the directors to strike from the books a large liability from the active accounts. If the action of the board of directors had actually made available a sum of money for dividends, the plaintiff would have a right of action at law to recover the amount due on his stock and would not have come into a court of equity for redress. But this the board of directors did not do. The board merely declared a plan to adjust and settle deferred dividends upon the corporation's preferred stock, with such of the holders thereof as were willing to accept such settlement, by paying seven and one-half per cent of such accumulated dividends in cash, fourteen per cent thereof in preferred stock, and twelve per cent in the common stock of the corporation. The board of directors declared the thirty-three and one-half per cent dividend *only in the manner stated.*

The plaintiff contends:

1. That he is entitled as a matter of right under the express terms of his certificate of preferred stock to the immediate payment of these dividends.

2. That even if it should be determined that he has no such right under his certificate, the refusal of the board of directors to declare dividends sufficient to pay the accumulations on the preferred stock is, under the circumstances, an abuse of discretion and without justification.

3. That the rights of the preferred stockholders are not governed by the same rules which apply to declaration of dividends on common stock, in that the holders of preferred shares are entitled to have dividends declared from surplus net profits whenever such profits might be made available for distribution.

The preferred stock certificates provide, in part, as follows:

" The holders of the preferred stock are entitled out of any and all *surplus net profits* whenever ascertained to *cumulative* dividends at the rate of and not exceeding 6% per annum in the year beginning on the 1st day of April, 1898, and in each and every year thereafter, payable in quarterly installments *in preference and priority to any payment of any dividend* on the *common stock* for such quarter."

The certificate of incorporation contains the following provision in respect to capital stock:

" The Common Stock shall be subject to the prior rights of holders of the Preferred Stock as herein declared. If after providing for the payment of full dividend for any quarter on the Preferred Stock, and for any balance that may remain due on the cumulative dividends upon such Preferred Stock for preceding years and quarters, there shall remain any surplus net profits, any and all such surplus net profits, not in the opinion of the Board of Directors, required to provide for the maintenance, improvement, enlargement and operation of the property and business of the Corporation or for the payment of its liabilities, shall be applicable to dividends upon the Common Stock, when and as from time to time the same shall be declared by the Board of Directors, and the Board of Directors may declare, and out of such surplus net profits, may pay quarter yearly dividends upon the Common Stock of the said Corporation, but no such quarterly dividends shall be declared or .paid until the cumulative dividends shall have been paid in full upon the Preferred Stock for such quarter, and for all preceding years and quarters."

The amounts carried in the surplus account of the defendant for the years 1916, 1917 and 1918 are as follows: 1916, $16,238,743.43; 1917, $15,452,185.79; 1918, $17,256,547.70. Such surplus is derived from subtracting the .total liabilities of the company from the total assets, and of necessity comprises items of fixed capital as well as items which appear in the current assets. The current assets of the defendant company for the same period are as follows: 1916, $15,732,675.86; 1917, $20,408,868.32; 1918, $25,804,262.32. So that it appears on the face of the accounts of the defendant corporation that at the present time the company has sufficient money and assets to pay the deferred accumulated dividends. The plaintiff would, therefore, be entitled to succeed if his certificate of stock did in fact entitle him as a matter of right to the immediate payment of dividends at any time when there might be sufficient assets in the surplus account to pay the same. While it may appear from a casual reading of the preferred stock certificate that such dividends become immediately payable from the " surplus net profits whenever

ascertained," still it is apparent that the preference granted thereby to the preferred stockholders is simply a preference or priority over the common stockholders in the payment of dividends. The certificate should be read in the light of that portion thereof which states in respect to such dividends that the same are "*payable in quarterly installments in preference and priority to any payment of any dividend on the common stock for such quarter.*"

It is a well-known rule of law that stockholders are not creditors of a corporation, but are simply the owners of certain shares or interests therein. They are entitled to a distribution from the corporate property as a general rule only at such times as corporate funds are made available for distribution among the stockholders by proper action on the part by the board of directors. The board of directors of every corporation are the managers thereof. The only way to control a corporation is through the board of directors duly elected by the stockholders. The directors alone may say when, how and to what extent dividends are to be paid. The purchasers of preferred stock are supposed to purchase and hold the same with full knowledge of the general powers of the board of directors, and with full knowledge of the discretionary powers vested in such board, not only to declare dividends but to set aside from the corporate funds and property from time to time such sums as they may deem necessary for the general purposes of the business in which the corporation is engaged. It is the duty of the board of directors to set aside sufficient funds for depreciation and for all contingencies which may be reasonably expected to arise, as well as sufficient funds and property to enable the company to do and carry on its ordinary business. When the purchasers of the preferred stock in question took their certificates they took them with full knowledge of the general rules applicable thereto, and the courts have held in respect to certificates of a similar nature that the term *surplus net profits* cannot be taken to mean simply surplus carried on the books of the company, but contemplates surplus net profits *over* and *above* all surplus and reserves made by the directors in the exercise of their discretion for the purpose of properly conducting the corporate business. This question here involved has been

First Department, May, 1919.          [Vol. 187.

many times before the courts and has been considered by numerous text-book authors. In Clark & Marshall on Private Corporations (§ 517)(f) it is stated: " It is a well settled principle that whether or not dividends shall be paid, and the amount of the dividend at any time, is primarily to be determined by the directors, and there must be *bad faith* or *a clear abuse of discretion* on their part to justify a court of equity in interfering. The mere fact that a corporation has surplus profits out of which a dividend might lawfully be declared is not of itself sufficient ground for a court of equity to compel the directors to make a dividend, for they have a right to use surplus profits to extend the business of the corporation, or to make improvements and even to provide a surplus fund, if it is to the interests of the corporation to do so."

And at section 529 (e) the same authors state that the general rule applies " to preferred stock as well as common stock," and that " it is primarily for the board of directors to determine whether the condition of the company in any particular year is such as to warrant the declaration of a dividend, and the courts *will not interfere unless an abuse of discretion is shown.*"

In 2 Cook on Corporations (7th ed. § 545) it is said: " The board of directors declare the dividends, and it is for the directors, and not the stockholders, to determine whether or not a dividend shall be declared. When, therefore, the directors have exercised this discretion and refused to declare a dividend, there will be no interference by the courts with their decision, unless they are guilty of a *wilful abuse of their discretionary powers or of bad faith or of a neglect of duty.* It requires a very strong case to induce a court of equity to order the directors to declare a dividend, inasmuch as *equity has no jurisdiction, unless fraud or a breach of trust is involved.* There have been many attempts to sustain such a suit, yet, although the courts do not disclaim jurisdiction, they have quite uniformly refused to interfere."

And in Cook on Corporations (Vol. 1 [7th ed.], § 272) it is said: " It is largely a matter of discretion with a board of directors as to whether they will use the net profits for a dividend or will use them in the business of the company, although there is a limit to this discretion, and the courts will not allow

the directors to use their power oppressively by refusing to declare a dividend where the net profits and the character and condition of the business clearly warrant it. This is the rule where all the stock is common stock, and it is also the rule in regard to *dividends on preferred stock.* The preferred stockholder is not entitled as a matter of right to his dividend,. even though there are *net profits which might be used for that purpose.*"

In Morawetz on Corporations (2d ed. § 460) the following language is used in respect to the power of the court to compel the declaration of dividends: " The power of deciding this question should not be taken from the directors and assumed by the courts, unless it is clear that the directors have a mistaken view of their legal duties, or have acted in bad faith."

The above rules have been applied in numerous cases, notably the following: *Greeff* v. *Equitable Life Assurance Society* (160 N. Y. 19); *Wilson* v. *American Ice Co.* (206 Fed. Rep. 736); *New York, etc., Railroad* v. *Nickals* (119 U. S. 296).

That the language used in the preferred stock certificate under consideration in the instant case does not deprive the directors of the defendant company of the usual powers in respect to declaring dividends is upheld by ample authority, and the courts have uniformly rejected constructions of stock certificates which would deprive directors of such powers.

In *United States Life Ins. Co.* v. *Spinks* (96 S. W. Rep. 889, 892) it is said: " The word ' dividend ' has a well defined legal meaning. *. * * it signifies such portion of accumulated net earnings or surplus as the directorate of a corporation may deem expedient to be distributed." (*Field* v. *Lamson & Goodnow Mfg. Co.*, 162 Mass. 388; *Warren* v. *King*, 108 U. S. 389.)

The preferred stock certificate in the instant case is drawn in the usual terms. There is nothing in it which would signify that it was the intention of the corporation to give to its preferred stockholders any greater rights or privileges than are usually extended to preferred stockholders in other corporations. The certificate simply gives preference and priority over the common stock in respect to the payment of dividends. The very fact that the certificate provides for cumulative dividends renders it practically impossible for the

directors to administer the corporation so as to deprive the preferred stockholders of any substantial rights, as these accumulated dividends must be paid before any distribution can be made to the holders of the common stock. There is, therefore, no reason to construe or interpret the provisions of the preferred stock certificates so as to deprive the board of directors of their usual and ordinary powers and duties in respect to the declaration of dividends and the general management of the corporation. There are, of course, cases where certificates of stock place the holders in practically the situation of creditors, and a certificate could be so drawn as to entitle a preferred stockholder to the payment of interest or dividends immediately out of the first profits made by the corporation, but the certificate of stock under consideration contains no such provision. In fact, it is in substantially the same language as the form set forth in White on Corporations (4th ed. p. 1483) which is in common use. If it were the intention of the corporation to give to the preferred stockholders an absolute right to dividends as soon as a surplus was ascertained, it was wholly unnecessary to add to the certificate a provision in respect to preference over the owners of common stock. (*New York, etc., Railroad v. Nickals,* 119 U. S. 296.)

The *Nickals* case is the leading authority on the question under consideration. In that case the Supreme Court of the United States says: " The court below adjudged, in effect, that the right to a dividend, for the year ending September 30, 1880, payable out of the 'net profit' arising from the operations for that period, was *absolutely secured to preferred stockholders* both by the plan and agreement and by the articles of association. Such, it held, was the contract between the company and the preferred stockholders, which the court was not at liberty to disregard. This, in our judgment, is an erroneous interpretation of both the agreement and the company's charter. There is nothing in the language of either necessarily depriving the directors of the discretion with which managing agents of corporations are usually invested, when distributing the earnings of property committed to their hands. * * * The directors of such corporations, having opportunities not ordinarily possessed by others of knowing the resources and

condition of the property under their control, are in a better position than stockholders to determine whether, in view of the duties which the corporation owes to the public, and of all its liabilities, it will be prudent in any particular year to declare a dividend upon stock.  *  *  *  That instrument did, indeed, provide for preferred shareholders being paid a dividend of six per cent before any dividend was paid to common shareholders.  But it was not intended to confer upon the former an absolute right to a dividend in any particular year, dependent alone on the fact, or the official ascertainment of the fact, that there were profits in that year, after paying operating expenses and fixed charges.  *  *  *  What was stipulated to be paid to them as holders of preferred stock in the new company was not a *debt*, payable in every event out of the general funds of the corporation, but a *dividend*, ' as declared by the board of directors,' and payable out of such portion of the profits as should be set apart for distribution among shareholders.  *  *  *  That the parties contemplated a declaration of a dividend, and not a mere statement of net profits during a designated period, is made evident by the requirement that ' dividends ' to preferred stockholders should be paid ' in preference to the payment of any dividend on the common stock.'  *  *  *  A declaration of profits, as, in itself, and without further action by the directors, entitling shareholders to dividends, is unknown in the law or in the practice of corporations.  Dividends are ' declared ' by some formal act of the corporation."

In the case of *Williston* v. *Michigan Southern & Northern Indiana R. R. Co.* (95 Mass. 400), which is cited in the *Nickals* case, a certificate of preferred stock contained a *guaranty* that the dividends should be paid.  The following is a quotation from the stock certificate there being considered: " Said stock is entitled to dividends at the rate of ten per cent. per annum, payable semi-annually in New York, on the first days of June and December in each year, out of the net earnings of said company, and is also entitled to share *pro rata* with the other stock of the company in any excess of earnings over ten per cent. per annum; and the payment of dividends as aforesaid is *hereby guaranteed.*"

Even in spite of the language used, the court held that the preferred stockholders were not entitled to dividends before the same were properly declared by the board of directors. Other cases in point are: *Field* v. *Lamson & Goodnow Mfg. Co.* (162 Mass. 388); *Chaffee* v. *Rutland R. R. Co.* (55 Vt. 110); *St. John* v. *Erie R. Co.* (22 Wall. 136); *Warren* v. *King* (108 U. S. 389).

It, therefore, appears that the certificate of preferred stock in question gave to the appellant no special rights or privileges not ordinarily enjoyed by holders of preferred stock in corporations in general, and that neither the certificate of stock nor the articles of incorporation deprived the directors of the defendant company of their usual or ordinary powers and duties respecting the management of the corporation and the declaration of dividends.

We, therefore, come to the consideration of the second branch of the case, which involves an examination of the accounts of the defendant company and the acts of the board of directors for the purpose of determining whether or not such directors have been guilty of bad faith or of any abuse of discretion in refusing to declare the dividends asked by the appellant on his preferred stock.

At the time the defendant's directors proposed the aforesaid scheme for financing the defendant company, which resulted in the deposit of approximately ninety-one per cent of the preferred stock under the agreement above referred to, the defendant was confronted with a situation which required the raising of a large sum of money. As above stated, the company's bonded indebtedness was $14,497,000, of which $10,151,000 was due in 1918, and the balance in 1935. The deferred dividends on the preferred stock amounted, as above stated, to the sum of $7,506,244.50. The time had come when it was necessary for the board of directors to make plans for the retirement of the bonds due in 1918. The company also had other bonds outstanding which became due in 1935. If a new bond issue took place without the retirement of the last-mentioned bonds they would be a prior lien. The current assets at that time were a trifle over $15,000,000. Those current assets, as was testified to by both the treasurer and the president of the defendant company, constituted the

true working capital of the company.   As both of those officers testified, the normal working capital was from $15,000,000 to $16,000,000.   The conditions, however, which followed our entry into the world war greatly increased the amount required for working capital, and in the opinion of the treasurer and president the amount necessary for working capital had increased to from $24,000,000 to $25,000,000.   Such statements are borne out by an examination of the accounts of the company.   In 1916 the inventoried goods and materials of the company at cost were $7,499,255.56.   In 1918 such goods and materials on hand had increased to $18,869,666.88, an increase of over $11,000,000.   This stock was carried at cost, and, among other things, represented $13,000,000 of wood, whereas the testimony shows that the normal amount so invested was from $6,000,000 to $7,000,000.   It is a matter of common knowledge that the value of the materials used in the pulp and paper business have doubled in the past few years.   So that it was unquestionably necessary for the corporation to expend vast sums for material in order to carry on its ordinary business.   To meet this situation the board of directors, in proposing its plan for financing the company, estimated that the following sums were necessary: $10,000,000 to retire bonds about to mature; $7,500,000 to pay deferred dividends on the preferred stock; $10,000,000 for increase of working capital.   The aforesaid proposal of the board of directors was, therefore, the direct result of a condition which demanded immediate action on the part of the directorate to provide sufficient funds to carry on the company and retire or refund the outstanding bonds.   As a part of the proposal the holders of the preferred stock were asked to accept seven and one-half per cent in cash and twenty-six per cent in stock in liquidation of the accumulated dividends on their stock.   Such acceptance of corporate stock would, of course, wipe out a large liability account.   It is evident that the board of directors, in the exercise of their sound discretion, determined that no more than seven and one-half per cent could be paid on the preferred stock in cash at that time.   It is most probable that the directors were acting for the best interests of the defendant company.   The accounts, however,

show that since the aforesaid proposition was made in January, 1917, the defendant company has apparently made a large sum of money, so that its accounts on August 31, 1918, disclose that large assets have been accumulated out of which dividends on the preferred stock can be paid if the directors consider such payment advisable and for the best interests of the corporation. The court is, therefore, asked to determine whether or not, under existing conditions, the board of directors were guilty of any abuse of discretion in failing to declare the dividends necessary to pay the amount of the accumulated dividends on the preferred stock. As above stated, such accumulated dividends now amount to the sum of $688,257.50. In 1917 and 1918 general dividends were declared, amounting to six per cent on the preferred stock, but no dividends have been paid on the common stock.

The appellant claims that assets are available from which such dividends should be declared, and bases this claim in part upon the testimony of defendant's officers. The treasurer of the defendant testified that only the sum of approximately $24,000,000 is necessary as working capital. The balance sheet of the defendant shows that on August 31, 1918, the total current assets were $25,804,262.32, a difference of nearly $2,000,000 over the sum testified by the treasurer to be necessary to carry on the defendant's business. The defendant also carries as a part of its capital assets securities amounting to the sum of $11,512,736.15. Of these securities, $750,000 are in Liberty bonds. There can be no criticism in respect to the purchase by the defendant of securities. Every well-managed corporation should carry a portion at least of its surplus in securities, which can be used as collateral from time to time as occasion requires and which constantly yield interest. Such securities are carried as a part of the fixed capital. The learned trial court found in the twenty-first finding of fact as follows:

" *Twenty-first.* That the defendant corporation has sufficient current assets, United States Liberty Loan Bonds and securities to constitute an available fund large enough out of which the cumulative deferred dividends amounting to $688,257.50 unpaid to its non-assenting preferred stockholders may be paid to them without substantially affecting or impairing its

credit or financial condition, or its requisite or normal net working capital, after making reasonable provision against such accidents and losses as are incidental to the business in which it is engaged and after setting aside sufficient sums to meet current expenses, sinking funds, insurance funds, depreciation, contingencies and other legitimate expenses properly chargeable to its earnings."

The appellant, therefore, argues that as the trial court has found that the defendant apparently has sufficient current assets to run the company, there is no reason why the dividends claimed should not be immediately paid. In the nineteenth finding of fact, however, the court found:

" *Nineteenth.* That the current assets of the Company on August 31, 1918, as set forth in the Fifteenth finding of fact, were *not excessive and were required in the business of the Company.*"

It is, therefore, apparent that the two findings are conflicting. So that in considering the question it is necessary to go back to the evidence in the case and the rules governing the acts of the board of directors. The directors have during the last three years paid off a large amount of the bonded indebtedness from profits, so that the present bonded indebtedness of the company is the sum of only $7,192,000. As above stated, however, the sum of $18,869,666.88 appears in the current assets account as " Finished Goods, Materials, etc., at Cost." The testimony shows that approximately $13,000,000 of this is wood. It can, therefore, be seen at a glance that if the value of materials should decline at the same rate as they increased the company would be left with insufficient working capital. This sum of $18,869,666.88 does not represent actual profits as the materials have not been turned into money. Moreover, the apparent large profits may pass into the air on a falling market. In fact, the profits are based on abnormal business conditions and are not the result of steady growth and fixed income. In my opinion, the directors were well within their powers in refusing to distribute large additional sums as dividends from the first substantial gain the company had made. The action was tried in October, 1918. Since the trial an armistice with the Central Powers has been made, and it is apparent that new

conditions will confront the defendant company. While perhaps in ordinary times the case is one which might justify the court in directing a distribution of the dividend asked by the plaintiff, as the above decisions show, the courts act in these cases with great reluctance, and only interfere with the discretionary powers of directors of corporations when it is apparent that such powers have been abused or that there has been bad faith. No such conditions are shown to exist here. These directors alone knew the conditions confronting the defendant corporation.

In the condition of the finances of the corporation at the time, they did not feel warranted in declaring a cash dividend to the preferred stockholders to satisfy the accumulated dividends of thirty-three and one-half per cent upon their preferred stock holdings. The board of directors in whose keeping the affairs of the corporation had been intrusted, honestly believing that they were acting for the best interests of the stockholders, evolved a plan to relieve the financial stringency of the hour, by providing additional working capital, in preparing the corporation to meet impending bond obligations and in discharging the liability of the corporation to the preferred stockholders for these accumulated dividends. That the directors were at the time and under existing conditions acting well within their discretion, seems to me beyond question. We are not to judge their action in the light of subsequent events which have increased the earnings and inflated the assets of the corporation away beyond the dreams of the most optimistic. We are to pass upon the wisdom of their action under the conditions with which the corporation was confronted when that discretion, now so violently assailed, was exercised. Nor are we to rest in the sublime confidence that the present affluence of the corporation is to be perpetual. It is quite within the realm of possibility that the next two years may see a return to conditions existing at the time when these directors thought it wise and necessary, to avert financial ruin for their company, to adopt the plan which is now criticised.

Before the court, with the necessarily limited knowledge which it can obtain of the affairs of the corporation, presumes to intervene and set aside the discretion of duly elected

directors, skilled in the business and in the affairs of the corporation intrusted to them, it should be very sure that it is as fully informed of the conditions and necessities of the corporation as were the duly constituted guardians of its affairs, and that there has been on their part a clear breach of trust. I think the record before us discloses no such abuse of discretion as to require the court's interference.

The judgment appealed from, dismissing plaintiff's complaint, should be affirmed, with costs.

CLARKE, P. J., LAUGHLIN, PAGE and SHEARN, JJ., concurred.

Judgment affirmed, with costs.